# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| QUINTON B., | |
| Plaintiff, | |
| v. | No. 20 CV 5471 |
| MARTIN O'MALLEY, COMMISSIONER OF SOCIAL SECURITY,[1] | Magistrate Judge McShain |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Quinton B. brings this action for judicial review of the Social Security Administration's (SSA) decision denying his applications for benefits. For the following reasons, plaintiff's request to reverse and remand the SSA's decision is denied, the Commissioner of Social Security's motion for summary judgment [28] is granted,[2] and the decision denying plaintiff's applications is affirmed.

## Background

### A.    Procedural Background

In September 2015, plaintiff filed an application for child's insurance benefits based on disability. [14-1] 206. In January 2015, plaintiff also filed an application for supplemental security income (SSI). [*Id.*]. Both applications alleged a disability onset date of June 6, 2008. [*Id.*]. The applications were denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing before an administrative law judge (ALJ), which proceeded on July 28, 2017. [*Id.*] 94-139. In a written decision dated November 22, 2017, the ALJ found that plaintiff was not disabled and denied his applications for benefits. [*Id.*] 206-17. On February 6, 2019, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ with instructions to (1) obtain additional evidence concerning plaintiff's impairments,

---

[1] In accordance with Fed. R. Civ. P. 25(d), Martin O'Malley, the current Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [14], which refer to the page numbers in the bottom right corner of each page.

including, if warranted and available, a consultative examination and medical source opinions about what plaintiff can still do despite his impairments; (2) obtain evidence from a medical expert related to the severity of and functional limitations resulting from plaintiff's impairments; (3) evaluate plaintiff's alleged symptoms and provide a rationale in accordance with governing regulations; and (4) give further consideration to the claimant's maximum residual functional capacity (RFC) during the entire period at issue and provide rationale with specific references to evidence of record in support of the assessed limitations. [*Id.*] 226-27. Following a second hearing in September 2019, at which the ALJ took testimony from plaintiff, an independent medical expert, and a vocational expert, the ALJ issued a written decision in December 2019 again finding that plaintiff was not disabled. [*Id.*] 13-27. The Appeals Council denied further review in July 2020, [*id.*] 1-6, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff then appealed to this Court [1], and the Court has subject-matter jurisdiction over the appeal pursuant to 42 U.S.C. § 405(g).[3]

### B.    The ALJ's Decision

Plaintiff, who at the time he applied for SSI benefits was twenty-four years old, alleged that he was disabled because of asthma, migraines, hypertension, and Ehlers-Danlos syndrome. [14-1] 410. Ehlers-Danlos is a "rare" and inherited "genetic condition[ ] that affect[s] connective tissue" and varies widely in severity. *Haley v. Saul*, Cause No. 3:20-CV-282 DRL, 2021 WL 3400804, at *3 (N.D. Ind. Aug. 4, 2021); *Fryrear v. Comm'r of Soc. Sec.*, No. 18-cv-3148, 2019 WL 5549239, at *4 n.2 (C.D. Ill. Oct. 25, 2019). The ALJ reviewed plaintiff's disability claim in accordance with the SSA's five-step sequential evaluation process. At step one of his decision, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date. [14-1] 16. At step two, the ALJ determined that plaintiff had the following severe impairments: migraines, connective tissue disease, joint dysfunction, hypertension, and organic mental disorder. [*Id.*]. At step three, the ALJ ruled that plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. [*Id.*] 16-17.

Before turning to step four, the ALJ found that plaintiff had the RFC to perform a limited range of sedentary work:

I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except I find that the claimant has the residual functional capacity to lift and/or carry up to 10 pounds occasionally and lighter weights frequently, and has no limitations in his ability to sit throughout an 8 hour workday. The claimant can stand and/or walk for ten continuous minutes, and for

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [6].

a total of two out of eight hours. He can push or pull occasionally, but can never operate foot controls. He is able to ambulate effectively, but ought not be required to perform more than minimal ambulation on uneven surfaces. The claimant can occasionally climb ramps and stairs, and he can occasionally stoop, kneel, crouch and crawl, but he can never balance or climb ladders, ropes or scaffolds. He can frequently use his hands to perform fine or gross manipulation, but cannot perform forceful grasping or torqueing [*sic*] or precision manipulation of objects the size of paper clips. The claimant should avoid concentrated exposure to heat or cold, or to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. He ought not be exposed to light or noise exceeding that which is generally encountered in office-type environments. He should not be required to look at computer screens for prolonged periods. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and he should avoid concentrated exposure to unguarded hazardous machinery. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He can perform work at an average production pace, but is incapable of work involving unusually high or variable production pace. He is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public which is incidental to his primary job duties. He is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks.

[14-1] 17-18.

At step four, the ALJ found that plaintiff had no past relevant work. [14-1] 26. At step five, the ALJ ruled that significant numbers of jobs existed in the national economy that plaintiff could perform, such as dresser (approximately 10,000 jobs) and small products assembler (approximately 40,000 jobs). [*Id.*] 26-27. Accordingly, the ALJ found that plaintiff was not disabled.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

### I. The ALJ Reasonably Rejected The Medical Expert's Testimony That Plaintiff's Impairments Equaled Listings 11.14, 11.04, and 11.02.

Plaintiff first argues that the ALJ erred because he did not properly weigh the opinion of Dr. Allan Goldstein, an independent medical expert who opined that plaintiff's impairments were medically equivalent to Listings 11.14 (peripheral neuropathy), 11.04 (vascular insult to the brain), and 11.02 (epilepsy) in combination. [25] 4-6. Plaintiff argues that the ALJ should have accepted Dr. Goldstein's opinion because it was supported by medical evidence, there was no contrary opinion evidence, and the ALJ never explained why he gave more weight to evidence that was inconsistent with Goldstein's opinion than to the evidence that allegedly supported it. The Commissioner responds that the ALJ reasonably rejected Dr. Goldstein's opinion after concluding that the record did not contain evidence of "listing level severity." [29] 4.

4

## A.     Rules for Evaluating Medical-Equivalence Opinions

"At step three, the ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling–that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020). "An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 404.1525(a), or if it is 'medically equivalent' to a listing, *id.* § 404.1526(a)." *Id.* "A medically-equivalent impairment has characteristics 'at least of equal medical significance' to all the specified criteria in a listing." *Id.* (quoting 20 C.F.R. § 404.1526(b)). Thus, to show that an impairment is medically equivalent to a listed impairment, the claimant must demonstrate that "her impairment is at least equal in severity and duration to the criteria of any listed impairment," such as by "offering other findings related to her impairment that are at least of equal medical significance to the required criteria." *Deloney v. Saul*, 840 F. App'x 1, 4 (7th Cir. 2020) (internal quotation marks and brackets omitted).

In cases like this one, where "an adjudicator at the hearings level obtains ME [medical expert] testimony . . . about whether an individual impairment[ ] medically equals a listing, the adjudicator cannot rely on an ME's conclusory statement that an individual impairment[ ] medically equals a listed impairment[ ]." Social Security Ruling (SSR) 17-2p, 2017 WL 3928306, at *4 (Mar. 27, 2017). If the expert concludes that "the individual impairment[ ] medically equals a listed impairment, the adjudicator must ask the ME to identify medical evidence in the record that supports the ME's statements. *Id.* "[A]n adjudicator . . . must consider all evidence in making a finding that an individual's impairment(s) does not medically equal a listing." *Id.* If the adjudicator "believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.* Rather, "a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding." *Id.* "An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." *Id.*

"[A] claimant bears the burden of proof at step three." *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022).

## B.     The ALJ's Rejection of Dr. Goldstein's Opinion

The ALJ gave no weight to Dr. Goldstein's opinion that plaintiff's Ehlers-Danlos syndrome equaled the severity of Listings 11.14, 11.04, and 11.02 in

5

combination. First, in his step-three discussion, the ALJ found that plaintiff's migraines, connective tissue disease, and joint dysfunction did not meet or equal a listed impairment because there was no evidence that these impairments were of "listing level severity":

> Dr. Allan Goldstein, an impartial medical expert testified at the supplemental hearing in this matter and opined that the claimant's impairments medically equal listings 11.14, 11.04, and 11.02, in combination, as there is no direct listing that accounts for the claimant's Ehlers-Danlos symptoms and hemiplegic migraines.
>
> Nonetheless, I find that based on a comparison of the objective medical evidence and the requirements of the applicable listings, the claimant did not have an impairment that met or equaled one of the listed impairments. In reaching this finding, all of the claimant's impairments have been considered, both individually and in combination. Specifically, the claimant's impairments were evaluated under listings 1.02, 11.14, 11.02, 11.04, and 14.09 and Social Security Rulings 14-2p and 19-2p.
>
> The claimant has migraines, but there is no evidence of the significant findings as required of any section in category 11.00 for neurological disorders. Specifically, all of the requirements of medical listing 11.04 are not demonstrated in the record. While the claimant has some complaints of a cognitive impairment, and memory problems, they are not of listing level severity.
>
> Moreover, the claimant's migraines are not shown throughout the record to be as severe or frequent as alleged. In fact, there are minimal objective findings supporting the severity of his migraines.
>
> The claimant's connective tissue disease does not meet or equal the requirements of medical listing 14.06 [which addresses undifferentiated and mixed connective tissue disease]. The medical record does not demonstrate the significant manifestation of symptoms or signs including fatigue, fever, malaise, or weight loss. There was no demonstration of significant limitation of daily activities or social functioning. The claimant had some fatigue and moderate deficiencies of concentration, persistence or pace but this does not approach listing level severity.
>
> The claimant's joint dysfunction does not meet or equal the requirements of any section in category 1.00 for musculoskeletal impairments, specifically section 1.02 [which addresses major

dysfunction of a joint]. Physical examinations have revealed no significant findings on evaluation or x-ray satisfying listing 1.02 criteria. The claimant has complaints of weakness of both the upper and lower extremities. However, examinations do not demonstrate any significant limitations or significant abnormal findings. The claimant has minimal decreased strength but there is no evidence of limited movement or other objective findings. The claimant can ambulate effectively, and perform fine and gross movements effectively.

[*Id.*] 16-17.

Second, in the section of his decision discussing the opinion evidence, the ALJ explained at length why he did not find Dr. Goldstein's medical-equivalence opinion credible:

Dr. Goldstein testified that the claimant has the following medically determinable impairments: Ehlers-Danlos syndrome with muscle weakness and difficulty walking, myopathy, and neuropathy; hemiplegic migraines; asthma with frequent exacerbations; joint pain; and rheumatoid arthritis that was considered at one time. He testified that the claimant's impairments in combination would medically equal listings 11.14, 11.04, and 11.02, as there is no direct listing that accounts for the claimant's Ehlers-Danlos symptoms and hemiplegic migraines. I asked Dr. Goldstein further about the basis of the medical equivalence opinion that he rendered and the cited evidence impressed me as significantly less than required by the listings. He testified that his opinion is based on a biopsy that showed muscle changes (Ex. 8F/1), evidence that the claimant exhibited a wide based gait and difficulty getting up at a consultative examination (Ex. 15F), and documentation of weakness of extremities (Ex. 6F; 8F). Dr. Goldstein cited Ex. 6F/9 for difficulty with ambulating and progressive weakness; Ex. 7F/5 for weakness of the arms and legs; and Ex. 2F for hemiplegic migraines. He also cited to diagnoses of Ehlers-Danlos type 3 with muscle weakness, migraine variant, and hemiplegic migraines (Ex. 23F/4). He testified that the records reflect the claimant was recommended for aqua therapy for joint pain (Ex. 23F/6). However, it is still unclear what else establishes equivalence, as Exhibit 8F, pages 4, 19, and 26 reflect a slight decrease in strength at 4/5 and Exhibit 6F, page 5 notes that although the claimant has some weakness, he exhibited a normal gait and station. Additionally, the consultative examination also reflects that the claimant exhibited normal grip strength, normal power of the extremities, and normal range of motion (Ex. 15F). Nonetheless, the claimant's weakness and times of abnormal gait are accounted for in limiting the claimant to sedentary work with other restrictions

including a walking limitation, push/pull restriction, and postural and manipulative limitations.

Additionally, Dr. Goldstein cited the history section of treatment notes, as well as the consultative examination in April 2015 when testifying to the severity and frequency of the claimant's migraines. However, this is based on subjective reports and Dr. Goldstein could not cite to the treatment records. The treatment records do not reflect the severity or frequency alleged. The residual functional capacity provides restrictions relative to the claimant's migraines and more restrictive limitations are not supported by the record, as more fully set forth above.

In further support of his opinion, Dr. Goldstein cited Dr. Colbert's opinion at Exhibit 28F, that indicated the claimant suffered flare-ups with pain, swelling, and stiffness 4 to 5 times a month relative to rheumatoid arthritis. However, it appears that Dr. Goldstein is relying on a doctor's opinion, rather than actual treatment records, to support the frequency of flares. As more fully set forth above, Dr. Colbert's opinion is not supported by treatment records, but rather it appears to be based on subjective reports. Finally, although Dr. Goldstein testified that he does not believe a diagnosis of rheumatoid arthritis is supported, he testified that the claimant possibly equals the listing for rheumatoid arthritis, 14.09.

Based on the above, I afford Dr. Goldstein's opinion no weight, as it is not supported by the treatment records or any specific medical findings to justify the opinion.

[14-1] 16-17, 24-25.

## C. Discussion

The Court concludes that the ALJ reasonably rejected Dr. Goldstein's opinion because it was not supported by medical evidence that demonstrated plaintiff's impairments equaled a listed impairment.

Substantial evidence supports the ALJ's finding that plaintiff's impairments did not equal Listings 11.14, 11.04, or 11.02. Listing 11.14, which addresses peripheral neuropathy, requires evidence of either (A) disorganized motor functions in two extremities "resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities," or (B) evidence of a marked limitation in physical functioning and a marked limitation in one of four areas of mental functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14.

8

Regarding the (A) criteria, the ALJ accurately concluded that Dr. Goldstein did not cite any evidence that would have supported a finding that plaintiff was extremely limited in his ability to rise from a seated position, balance while standing or walking, or use his arms or that his impairments caused an equivalent limitation. To the contrary, Goldstein relied on a 2015 consultative examination in which the examiner observed only that plaintiff "did have difficulty getting up and ambulating," but that plaintiff "ambulates without help and assistance" despite his "slow gait with a wide base." [14-2] 1001. But an "extreme" limitation in this area means "the inability to stand up from a seated position." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00D2. Goldstein did not cite to any such evidence, nor does plaintiff identify evidence of extreme limitations in these three areas of functioning in his briefs. *See* [25] 4-6. And while Dr. Goldstein relied on a 2013 treatment note reflecting plaintiff's "lifelong weakness of the limbs," *see* [14-1] 675, this treatment note did not indicate the severity of that weakness–and thus it could not have supported a finding that plaintiff's were equivalent to the extreme limitations contained in Listing 11.14(A).

As for the (B) criteria, the ALJ reasonably found that the evidence relied on by Dr. Goldstein was not of "listing level severity" because it did not show anything equivalent to a "marked" limitation in physical functioning, *i.e.* that plaintiff was "seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00G2. Indeed, the ALJ observed that treatment notes mentioned by Dr. Goldstein reflected that plaintiff had "normal" upper limbs, only slight decreases in strength, "brisk" reflexes, motor strength of 4/5 or 5/5, "normal" power in his upper and lower legs, and 5/5 grip strength and power in both upper extremities. *See* [14-1] 698, 705; [14-2] 1002. These records were obviously inconsistent with Dr. Goldstein's opinion and thus supported the ALJ's decision to discredit that opinion. *See Deloney*, 840 F. App'x at 4 (affirming ALJ's determination that plaintiff's impairment did not equal listing where ALJ "provided an extensive explanation for why Deloney's impairments were not as debilitating as alleged"). The ALJ also concluded that, to the extent that Goldstein had relied on the opinion of plaintiff's rheumatologist, Dr. Carmelita Colbert, that plaintiff suffered four to five arthritis-related flares per month, with each lasting two to three days and requiring a doctor's visit, that reliance was unwarranted because Colbert's own treatment records did not demonstrate arthritis flares occurring with that frequency or level of severity. *See* [14-1] 25. As the Court explains in more detail below, the ALJ reasonably decided that Dr. Colbert's opinion about the severity of plaintiff's arthritis flares was not entitled to controlling weight and adequately explained why it warranted only little weight. Finally, the ALJ reasonably found that Dr. Goldstein's opinion was not persuasive because Goldstein did not cite findings related to plaintiff's impairments that were equal to a marked limitation in any area of mental functioning. *See* [14-1] 16 ("While the claimant has some complaints of a cognitive impairment, and memory problems, they are not of listing level severity.").

Listing 11.04, which addresses vascular insult to the brain, requires evidence of (A) "sensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04A. Alternatively, and like Listing 11.14, Listing 11.04 may be met if (B) disorganized motor function in two extremities results in an extreme limitations in rising from a seated position, remaining balanced while upright, or using the upper extremities or (C) there is a marked limitation in physical functioning and a marked limitation in one of four areas of mental functioning. *Id.*, § 11.04B & C. Here, Dr. Goldstein did not cite any findings that were equivalent to sensory or motor aphasia that resulted in ineffective speech or communication, let alone that plaintiff experienced such limitations for at least three months. Dr. Goldstein did testify that it was necessary to consider Listing 11.04 "to bring in the rest of the hemiplegia" resulting from plaintiff's hemiplegic migraines and to consider "the vascular itself." [14-1] 44.[4] But as the ALJ reasonably–and accurately–explained, "[t]he treatment records do not reflect the severity or frequency" of plaintiff's hemiplegic migraines, [*id.*] 24-25. Nor did Goldstein purport to testify how the limitations caused by the hemiplegic migraines were equivalent to the criteria of this listing. It was therefore permissible for the ALJ to conclude that plaintiff's migraines did not cause restrictions that were the equivalent of Listing 11.04's (A) criteria. [*Id.*] 24-25. Furthermore, and for the same reasons given above with respect to Listing 11.14, the ALJ had a sound basis to reject Dr. Goldstein's opinion that plaintiff's impairments caused limitations that were equivalent to the (B) and (C) criteria of Listing 11.04.

Finally, the ALJ reasonably rejected Dr. Goldstein's opinion that plaintiff's impairments equaled Listing 11.02 because of the severity and frequency of plaintiff's hemiplegic migraines. Listing 11.02 addresses epilepsy and requires evidence of either generalized tonic-clonic seizures or dyscognitive seizures occurring at a certain frequency and despite adherence to prescribed treatment, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02A-B, or, in one instance, evidence of generalized tonic-clonic seizures occurring at a reduced frequency together with a marked limitation in either physical or mental functioning, *id.*, at § 11.02C. At the hearing, Dr. Goldstein testified that "[t]here is no abnormality that's listed specifically for migraine. So, we have to use 11.02. And 11.02 would give us the necessary hemiplegia." [14-1] 44. As the ALJ pointed out, however, "[t]he treatment records do not reflect the severity or frequency" of plaintiff's hemiplegic migraines, [*id.*] 24-25, and neither Dr. Goldstein nor plaintiff has identified medical records reflecting that plaintiff experienced hemiplegic headaches with a frequency and severity that was equivalent to the frequency and severity of the seizures on which Listing 11.02 is focused. Moreover, as the ALJ emphasized, "the record contains no opinion from a neurologist or specialist with regard to the claimant's migraines," nor were there any recent

---

[4] "A hemiplegic migraine is a rarer subtype of migraine with aura, characterized by the presence of motor weakness when the migraine attack manifests. This may include weakness or speech impairment, for instance." *Castillo v. Kijakazi*, Cause No. 3:22-CV-17 DRL-MGG, 2023 WL 2644242, at *4 n.3 (S.D. Ind. Mar. 27, 2023)

treatment notes from a neurologist respecting plaintiff's migraines. [*Id.*] 22. The ALJ therefore had a substantial evidentiary basis to reject this part of Dr. Goldstein's opinion.

Plaintiff's arguments that the ALJ erred in rejecting Dr. Goldstein's opinions lack merit.

Plaintiff first argues that the ALJ "improperly substituted his opinion for that of a qualified expert" in deciding that plaintiff's impairments did not equal a listed impairment, and that the ALJ should have provided a better explanation why he gave more weight to "the unfavorable findings" than to the evidence identified by Dr. Goldstein. [25] 4-5. But the ALJ's decision-making process–questioning Dr. Goldstein at the hearing about the evidence on which his opinion rested and evaluating whether that evidence supported Goldstein's medical-equivalence opinion–was prescribed by the applicable regulations themselves. Those regulations provide that an ALJ cannot simply accept a medical expert's medical-equivalence opinion; instead, the ALJ must question the expert about the evidence on which the opinion rests. *See* SSR 17-2p, at *4. Furthermore, the ALJ was not even required to "separately discuss equivalence" because "a simple statement of non-equivalence will suffice[.]" *Deloney*, 840 F. App'x at 4. Nevertheless, as in *Deloney*, "[t]he balance of the decision . . . cites ample evidence supporting the finding that [plaintiff's] impairments did not equal" Listing 11.14, 11.04, or 11.02 in combination. *Id.* In a related vein, plaintiff faults the ALJ for "fail[ing] to cite any medical opinion that contradicted Dr. Goldstein's opinion that Plaintiff's impairments medically equaled a listing." [25] 5. While the premise of plaintiff's argument is correct–there was no conflicting opinion on medical equivalence–plaintiff cites no authority for his apparent claim that the ALJ had to accept Goldstein's opinion because it was not contradicted by another medical-equivalence opinion. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The ALJ complied with that requirement by considering Dr. Goldstein's opinion and properly evaluated his opinion as SSR 17-2p required.

Second, plaintiff argues that part of the ALJ's reasoning was circular. [25] 5. As plaintiff observes, the ALJ found that plaintiff's weakness and abnormal gait could be accounted for by restricting plaintiff to a limited range of sedentary work. [14-1] 24. According to plaintiff, the ALJ used this finding as evidence that contradicted Dr. Goldstein's medical-equivalence opinion. The Court rejects this argument, which rests on a misreading of the ALJ's decision. Nowhere did the ALJ hold or suggest that plaintiff's impairments did not equal a listed impairment because plaintiff could perform some sedentary work. To the contrary, the ALJ evaluated the evidence in the record, including the evidence cited by Dr. Goldstein, and found that plaintiff's impairments were severe but did not rise to "listing level severity" and thus could be accommodated by restricting plaintiff to a very narrow range of sedentary work.

Third, plaintiff argues that the ALJ erred by relying on a purported–but, in plaintiff's view, nonexistent–inconsistency in Dr. Goldstein's opinion. [25] 5-6. As plaintiff observes, the ALJ appeared to discount Goldstein's opinion in part because, while Goldstein "testified that he does not believe a diagnosis of rheumatoid arthritis is supported," he also "testified that the claimant possibly equals the listing for rheumatoid arthritis, 14.09." [14-1] 25. The Court agrees with plaintiff that there was no meaningful contradiction between these two pieces of Dr. Goldstein's opinion: Dr. Goldstein explained why he did not believe plaintiff had rheumatoid arthritis (RA), even though other treaters did diagnose plaintiff with RA, but he also explained that, while it was possible to use Listing 14.09 (which addresses RA specifically) to evaluate plaintiff's impairments, he did not "like using just rheumatoid arthritis because that gets rid of the Ehlers Danlos, which I think is significant based on the chart." [*Id.*] 54. That said, the Court is convinced that this part of the ALJ's decision was not material to his conclusion that Dr. Goldstein's opinion deserved weight, given that substantial evidence supports the ALJ's reasons for rejecting that opinion that the Court has discussed above.

For these reasons, the Court rejects plaintiff's first ground for reversing the ALJ's decision.

## II.    The ALJ Reasonably Gave Little Weight To The Opinions Of Plaintiff's Treating Physicians.

Plaintiff next argues that the ALJ erred in evaluating the opinions of his treating rheumatologist, Carmelita Colbert, and his treating pulmonologist, Kevin Simpson. [25] 6-12.

Because plaintiff filed his claims before March 27, 2017, the opinions of plaintiff's treating physicians "on the nature and severity of a medical condition" were "entitled to controlling weight" if they were "supported by medical findings and . . . consistent with other evidence in the record." *Heath M. v. Kijakazi*, No. 20 CV 3384, 2023 WL 3652427, at *4 (N.D. Ill. May 25, 2023) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527. "An ALJ must provide 'good reasons' for how much weight he gives to a treating source's medical opinion." *D.K.H. v. Saul*, No. 19-cv-7755, 2021 WL 2566768, at *3 (N.D. Ill. Jun. 23, 2021). "When an ALJ decides for 'good reasons' not to give controlling weight to a treating physician's opinion, he must determine what weight to give to it and other available medical opinions in accordance with a series of factors, including the length, nature, and extent of any treatment relationship; the frequency of examination; the physician's specialty; the supportability of the opinion; and the consistency of the physician's opinion with the record as a whole." *Id.* "If the ALJ discounts the physician's opinion after considering these factors, the court must allow that decision to stand so long as the ALJ minimally articulated his reasons–a very deferential standard that the Seventh Circuit has

deemed lax." *Sonji L. v. Kijakazi*, No. 19 C 4109, 2022 WL 672741, at *5 (N.D. Ill. Mar. 7, 2022) (internal quotation marks and brackets omitted).

## A. Dr. Colbert's Opinion

Dr. Colbert, who began treating plaintiff on May 23, 2017, provided an opinion letter dated February 23, 2018. [14-3] 1782. Colbert noted that plaintiff had been treated by different rheumatologists since 2012 who had diagnosed him with Ehlers-Danlos and a metabolic myopathy, and that Dr. Colbert's own work up of plaintiff's case "revealed Rheumatoid Arthritis." [*Id.*]. According to Colbert, plaintiff took "prescription medication for his arthritis (hydroxychloroquine) which helps with pain, swelling and stiffness." [*Id.*]. Dr. Colbert added that, while there is no cure for RA and plaintiff "has 'flares' of his arthritis despite adequate medication," the hydroxychloroquine "helps prevent progression of the arthritis." [*Id.*]. Dr. Colbert opined that (1) plaintiff has "4-5 flares a month with each flare lasting 2-3 days"; (2) his flares "consist of increased pain, swelling and stiffness of the hands and wrists which affect his dexterity"; and (3) the flares "would require that he be absent from work in order to see the rheumatologist and get additional medication." [*Id.*]. Finally, Colbert noted that plaintiff also suffered from asthma and migraines "and sees specialists for these conditions as well." [*Id.*]. In her view, "the migraines would certainly affect [plaintiff's ability] to sit and monitor computer screens." [*Id.*].

After accurately summarizing the contents of Dr. Colbert's opinion, the ALJ explained why he gave it only little weight:

> I afford this opinion little weight, as Dr. Colbert had only been treating the claimant for approximately 9 months at the time of rendering her opinion and the treatment records do not support this degree of ongoing flares. For example, treatment notes from March 2019, reflect that the claimant was doing well overall and, although he complained of constant pain in his shoulder and knee, it was noted that the claimant['s] rheumatoid arthritis had improved and there was no mention of problems with the claimant's hands (Ex. 33F/194). Finally, Dr. Colbert's opinion is inconsistent with the claimant's own testimony in that the claimant testified that he does not always go to the doctor when he suffers a flare up, and rather treats his flare-ups with Tylenol and ice.

[14-1] 23.

The Court concludes that the ALJ gave good reasons for affording Dr. Colbert's opinion less than controlling weight. Most importantly, the ALJ found that the opinion was not supported by Dr. Colbert's own treatment records, "which do not support this degree"–four to five flares per month–"of ongoing flares." [14-1] 23; *see Johnson v. Colvin*, No. 14 CV 8425, 2016 WL 4479555, at *6 (N.D. Ill. Aug. 25, 2016)

13

(ALJ properly declined to give treating physician's opinion controlling weight because "it is not supported by the physician's own treatment notes"). Indeed, plaintiff cites no evidence in the record, whether in Dr. Colbert's treatment notes or elsewhere, to substantiate Colbert's opinion about the frequency of his arthritis-related flare-ups. *See* [25-] 7-9. Furthermore, the ALJ specifically discussed a March 2019 treatment note–prepared shortly after Dr. Colbert submitted her opinion–in which plaintiff was found to be "doing well overall," "denie[d] prolonged AM stiffness," and reported that medication "helped with muscle spasms." [14-4] 2421. Finally, the ALJ reasonably observed that plaintiff himself never testified that he needed to see a rheumatologist each time he had a flare up, as Dr. Colbert's opinion letter suggests.

For similar reasons, the Court finds that the ALJ minimally articulated why he concluded that Dr. Colbert's opinion was entitled to only little weight. As just discussed, Colbert's opinion was not supported by her own treatment records or plaintiff's testimony. Nor does plaintiff cite any evidence to corroborate Colbert's claim that he experienced arthritis-related flares four to five times per month. This was a key element of Dr. Colbert's opinion, but as far as the Court can tell, it was unsubstantiated. Furthermore, the ALJ permissibly relied on the length of Dr. Colbert's treating relationship–roughly nine months at the time Colbert provided the opinion letter–to question the persuasiveness of her opinion, given that plaintiff's impairments were chronic conditions and had been treated by other rheumatologists who had not expressed an opinion similar to Dr. Colbert's.

Plaintiff's contrary arguments lack merit.

First, plaintiff contends that the ALJ did not adequately explain why a nine-month treating relationship "was too short for [Dr. Colbert's] opinion to be persuasive." [25] 7. However, the ALJ's key findings were that Colbert's opinion was unsupported by her own treatment notes (and any other evidence in the record) and inconsistent with plaintiff's testimony, and these findings amounted to both "good reasons" for affording less than controlling weight to that opinion and a minimal articulation of why the opinion received essentially no weight. As just discussed, moreover, the ALJ minimally articulated why the length of Colbert's treating relationship factored into his weighing of Colbert's opinion. Had the ALJ's sole basis for rejecting Dr. Colbert's opinion been the length of the treating relationship, the Court would be presented with a different case that might require a different result. But here the ALJ gave other good reasons for affording the opinion less than controlling weight, and substantial evidence supported the ALJ's decision.

Second, plaintiff claims that the ALJ "failed to explain how he considered the evidence that Dr. Colbert provided in support of her opinion." [25] 7. According to plaintiff, there was ample evidence in Colbert's treatment records to reflect that, *inter alia*, plaintiff had synovitis in the hands and wrists, decreased wrist range of motion bilaterally, knee crepitus and pain with range of motion bilaterally, and muscle

14

spasms. [*Id.*] 7-8. But Dr. Colbert's opinion was significant not because it purported to catalogue the symptoms and limitations that plaintiff's RA, Ehlers-Danlos, and arthritis caused, but because it addressed the claimed frequency, duration, and severity of plaintiff's arthritis-related flares.[5] There is no question that the ALJ accepted that plaintiff suffered from these and other severe impairments or that the ALJ believed that plaintiff's impairments caused significant work-related limitations. Without evidence that substantiated Dr. Colbert's very specific–and very limiting–opinion, however, it was reasonable for the ALJ to discredit it. The fact that the record tended to confirm that plaintiff experienced significant limitations because of his medical impairments did not require the ALJ to accept Dr. Colbert's regarding a very severe subset of those limitations that was otherwise unsubstantiated.

Third, plaintiff's scattershot arguments in support of his broader contention that the ALJ failed to provide a "sound explanation for rejecting Dr. Colbert's opinion," [25] 8, lack merit given the Court's analysis above and amount to little more than nitpicking the ALJ's decision. *See Victor M. v. Kijakazi*, No. 20-cv-7073, 2022 WL 2105893, at *8 (N.D. Ill. Jun. 10, 2022) (courts must "read[ ] the ALJ's decision as a whole and giv[e] it a commonsensical reading rather than nitpicking at it"). Plaintiff contends that the ALJ cherry-picked the evidence by focusing on the March 2019 treatment note, *see* [25] 8, but he ignores that the ALJ could reasonably have found that this treatment note had particular salience because it was contemporaneous with Colbert's opinion letter but did not establish the frequency, duration, or severity of plaintiff's flare-ups. Plaintiff also faults the ALJ for accepting at face value his testimony about the frequency of flare-ups–"about 1 time a week," [14-1] 19–while rejecting other portions of his testimony as not credible. [*Id.*] 8-9. This bizarre argument, which suggests that the ALJ should have sua sponte discredited plaintiff's sworn testimony without any basis in the record for doing so and found that plaintiff's flares occurred more frequently than plaintiff himself claimed, provides no basis for reversal. Surely it was reasonable for the ALJ to expect plaintiff to provide accurate testimony about the frequency of his arthritis flares and accept it unless it was contradicted by other evidence demonstrating that he experienced flares on a more frequent basis (which it was not). Next, plaintiff chides the ALJ for "not seem[ing] to contemplate that Dr. Colbert's opinion was about [his] need to address his flares *while working*, and that he may not have required such medical treatment when he was not using his hands routinely." [25] 9 (emphasis in original). This argument, which rests on a speculative and unsupported interpretation of Colbert's opinion, has multiple problems. The crux of Dr. Colbert's opinion was that plaintiff's flares were severe enough that they required him to see a doctor and obtain medication, and that this would require plaintiff, if employed, to miss work. But, contrary to plaintiff's argument, Colbert's opinion does not tie the occurrence of flares to plaintiff's "routine[ ]" use of his hands. Nor, again, was there evidence that plaintiff

---

[5] Thus Dr. Goldstein had repeatedly relied on Dr. Colbert's opinion letter and its purported finding that plaintiff suffered four to five flares per month to support his medical-equivalence opinion. *See* [14-1] 45, 47-48, 53-54, 55.

regularly or repeatedly saw a doctor when he experienced flairs outside of a work setting (though plaintiff has never worked). Instead, as plaintiff testified, he usually treated them with Tylenol and ice. Plaintiff also contends that the ALJ "failed to acknowledge Dr. Colbert's opinion that [his] flares affected his dexterity, and instead focused on his treatment for flares." [25] 9. This argument cannot be squared with the ALJ's summary of the opinion, where the ALJ accurately recounted that Dr. Colbert opined that the flares "increased pain, swelling and stiffness of the claimant's hands and wrists." [14-1] 23.[6] Finally, plaintiff contends that if he "sought treatment for just one half of the flares that he experienced, he would still be absent in excess of what was generally tolerated." [25] 9. But the twin premises of this argument–that plaintiff experienced flares between four and five times per month, and that the flares required him to visit the doctor's office–are unsubstantiated. Accordingly, the ALJ was not required to adopt plaintiff's speculative assumption about what attendance level plaintiff could have maintained in an employment setting if he experienced a completely different rate of arthritis flares than the rate Dr. Colbert opined to.

For these reasons, the Court finds that the ALJ properly applied the treating-physician rule in affording only little weight to Dr. Colbert's opinion.

## B. Dr. Simpson's Opinion

Dr. Simpson provided an opinion letter dated March 7, 2018 regarding plaintiff's pulmonary condition. [14-3] 1786-87. Simpson, who had treated plaintiff for "only the last six months," opined that plaintiff suffered from "Severe Persistent Asthma which, despite maximum medical therapy, results in [plaintiff] feeling short of breath on a nearly consistent basis with frequent, nearly daily, episodes of worsened shortness of breath requiring additional inhalational bronchodilator therapy." [*Id.*] 1786. Dr. Simpson observed that, while plaintiff "seems to maintain a high level of function" on "most days" despite his asthma, plaintiff "experiences frequent exacerbations which result in his inability to perform any work related activities." [*Id.*]. Simpson acknowledged that the duration of his treating relationship with plaintiff "limits [his] ability to address the impact of his underlying asthma on his prior functional status," and that "describing an individual patient's limitations due to an episodic disease such as asthma is quite challenging." [*Id.*]. Nevertheless, Dr. Simpson's "best estimate" was that plaintiff's pulmonary condition "results in daily shortness of breath that routinely limits his ability to complete typical employment responsibilities and that [he] suffers frequent exacerbations resulting in inability to complete any employment activity during those periods." [*Id.*]. Finally, Dr. Simpson opined that plaintiff's condition "results in a 20% limitation (i.e., he can

---

[6] Nor can it be squared with the ALJ's RFC determination, which specified that plaintiff "can frequently use his hands to perform fine or gross manipulation, but cannot perform forceful grasping or torqueing [*sic*] or precision manipulation of objects the size of paper clips." [14-1] 23. It is unlikely, to say the least, that the ALJ would have considered these limitations if were unaware that plaintiff's arthritis flares affected his dexterity.

function at an 80% level) and that during exacerbations he is 100% limited (i.e., he can complete no work activities) with an expectation that exacerbations will occur at least twice a month with each exacerbation lasting up to 3 days." [*Id.*].

The ALJ gave Dr. Simpson's opinion only "little weight," concluding that "the treatment records do not reflect such frequent exacerbations" of plaintiff's asthma. [14-1] 23. The ALJ also found that Simpson's opinion "is inconsistent with the other treatment records that reflect the claimant's asthma is controlled." [*Id.*].

The Court concludes that the ALJ gave good reasons for affording Dr. Simpson's opinion less than controlling weight. First, the ALJ found that Simpson's opinion respecting the frequency of plaintiff's asthma exacerbations was not supported by Simpson's treatment records. Plaintiff does not contest this finding, as his briefs do not point to any medical records suggesting that plaintiff experienced asthma exacerbations as frequently as Dr. Simpson had opined. *See Givens v. Colvin*, 551 F. App'x 855, 861 (7th Cir. 2013) (ALJ reasonably discounted treating physician's opinion that was not supported by imaging tests or extended treatment relationship). Second, the ALJ found that Dr. Simpson's opinion was inconsistent with other evidence showing that his asthma was controlled. The ALJ cited to five treatment notes from 2018 and 2019 that reflected the following:

- Plaintiff had been diagnosed, by another provider, with moderate persistent asthma without complication on October 3, 2018. [14-4] 2292.

- Dr. Simpson saw plaintiff on November 7, 2018 for ongoing asthma management. Plaintiff told Simpson that "[t]he newer medication has helped and I haven't needed the inhaler as much," though plaintiff did need to use a medrol pack two weeks previously. Dr. Simpson's impression was that plaintiff's asthma was "VERY well controlled on present regimen" and that the "addition of 'add-on' ICS [inhaled corticosteroids] has been quite helpful." [14-4] 2344-45, 2347.

- On February 21, 2019, plaintiff was seen by nurse Kathleen Masella for follow-up regarding RA and asthma. Masella found that plaintiff had been using "NSI, fluticasone and azelastine and feels it has been helpful," and that "his asthma has been pretty good this month." Masella's treatment note also reflected that, during an April 13, 2018 visit, plaintiff's asthma had been rated as "Severity: 4/10." [14-4] 2405.

- At a rheumatology appointment on March 6, 2019, plaintiff reported "doing well overall." [14-4] 2421.

- At a follow-up appointment for allergy problems on May 15, 2019, plaintiff reported that he had been "using NSI, fluticasone and azelastine and feels it

has been helpful." Plaintiff also reported that "his asthma has been pretty good this month" and that he was "using his rescue inhaler less than 2 times per day and feels he is breathing better." [14-5] 2471.

As the ALJ noted, these treatment records do not reflect that plaintiff's asthma was poorly controlled, as Dr. Simpson had opined. To the contrary, these notes–particularly the November 7, 2018, February 21, 2019 and May 15, 2019 notes–reflect that plaintiff's asthma was reasonably well-controlled and thus provided a substantial evidentiary basis for affording less than controlling weight to Dr. Simpson's opinion. Again, plaintiff points to no evidence in the record to substantiate Dr. Simpson's opinion that plaintiff would essentially be incapacitated and unable to work twice per month due to asthma exacerbations. *Compare* [14-1] 20 (citing [14-4] 2295-96 (October 3, 2018 treatment note recounting that plaintiff's "[l]ast asthma exacerbation requiring prednisone was in May or June this year").

The Court also concludes that the ALJ minimally articulated his reasons for affording Dr. Simpson's opinions little weight. As just discussed, Simpson's opinions were not supported by his own treatment records, and plaintiff does not identify any other evidence in the record that was consistent with Simpson's opinions as to the frequency and severity of plaintiff's asthma exacerbations. The ALJ also permissibly relied on the relatively short duration of Dr. Simpson's treating relationship with plaintiff. Indeed, Dr. Simpson himself noted that the duration of their relationship "limits [his] ability to address the impact of his underlying asthma on his prior functional status." [14-3] 1786. Moreover, treatment notes post-dating Dr. Simpson's opinion letter–including Simpson's own note on November 7, 2018 that plaintiff's "Severe Persistent Asthma" was "VERY well controlled on present regimen"–tend to suggest that the six-month treating relationship was not sufficient to permit Simpson to provide an accurate and well-supported opinion as to the severity of plaintiff's asthma-related limitations, as these notes all rather clearly undermine his opinion.

Finally, the Court rejects plaintiff's arguments that the ALJ failed to consider the evidence that was consistent with or supported Dr. Simpson's opinions. Plaintiff contends that the ALJ failed to consider plaintiff's complaints of diffuse wheezing, Dr. Simpson's opinions that plaintiff's asthma was inadequately controlled, and the results of a 2018 pulmonary function test that showed "moderately-severe obstruction with VERY significant BDR and significant gas trapping." [25] 11. However, earlier in his decision, the ALJ thoroughly discussed Simpson's treatment records, including the 2018 pulmonary function report that plaintiff erroneously claims the ALJ failed to evaluate:

With regard to the claimant's asthma, in August 2017, it was noted that the claimant reported his asthma was better controlled since his medication was changed (Ex. 32F/21). In September 2017, it was noted that the claimant's symptoms had significantly improved with the

18

increase of Fluticasone and addition of Singular (Ex. 32F/35). The claimant was reporting only occasional shortness of breath and only needing the Albuterol once a week and the symptoms would resolve (Ex. 32F/35). In May 2018, the claimant reported that he was having to use his rescue inhaler only once a day, which was down from five times a day (Ex. 32F/359). On August 1, 2018, claimant's pulmonologist, Dr. Simpson noted that the claimant reported feeling a little better but still using his Albuterol inhaler twice daily with occasional relief and symptoms mainly at night (Ex. 33F/21).

Treatment notes from Dr. Simpson in September 2018, revealed the claimant complained of hand pain and asthma (Ex. 33F/20). *Pulmonary function testing revealed moderately severe asthma and the impression was severe persistent asthma (Ex. 33F/22)*. Additionally, it was noted that the claimant's allergies had improved, and that the claimant was allergic to cats but still owned a cat (Ex. 33F/36). In October 2018, it was noted that the claimant had moderately persistent asthma without complications (Ex. 33F/65). Also in that month it was noted that the claimant had 2 cats at home (Ex. 33F/69). It was noted that the claimant's last exacerbation was in May or June 2018 (Ex. 33F/69). By November 2018, Dr. Simpson noted that the claimant reported not needing to use his inhaler as much since starting a newer medication and used a dosepak 2 weeks ago but had not needed the inhaler since (Ex. 33F/118). It was further noted that the claimant's asthma was "very well controlled" on current regimen (Ex. 33F/120).

The claimant underwent allergy testing in December 2018, and it was noted that the claimant reported his asthma was up and down and in January 2019, it was noted that the claimant had chronic allergic rhinitis due to hair/dander (Ex. 33F/132, 146, 160). It was again noted that the claimant had moderate persistent asthma without complication (Ex. 33F/161).

In February 2019, the claimant reported that his asthma was pretty good that month and felt he was breathing better (Ex. 33F/178) and similarly in March 2019 the claimant was described as doing well overall (Ex. 33F/178, 194). Treatment notes from May 2019, reflect the claimant's asthma was pretty good and he reported breathing better (Ex. 33F/244). In July 2019, the claimant's asthma was again described as moderately persistent without complication (Ex. 33F/309).

[14-1] 20 (emphasis added).

This discussion convinces the Court that the ALJ properly engaged with the evidence on which Dr. Simpson's opinion rested and reasonably concluded, based on substantial evidence, to afford the opinion only little weight. It cannot be gainsaid that neither Simpson's treatment records nor the records from any other treater corroborate Simpson's extremely restrictive opinion about how plaintiff's asthma impacted his ability to work. As was the case with the ALJ's evaluation of Dr. Colbert's opinion, the fact that Simpson's treatment records generally corroborated the fact that plaintiff experienced significant symptoms from asthma did not require the ALJ to credit Simpson's unsupported opinion that the symptoms were so severe as to preclude the ability to work.

For these reasons, the Court finds that the ALJ properly applied the treating-physician rule in addressing Dr. Simpson's opinions, and substantial evidence supports his decision to give those opinions only little weight.

## III. The ALJ Properly Addressed Plaintiff's Physical RFC.

Plaintiff also argues that the ALJ failed to adequately evaluate his physical RFC. [25] 12-14. According to plaintiff, the ALJ failed to (1) explain how he determined that plaintiff had no limitations in his ability to sit, (2) identify any evidence suggesting that plaintiff could stand or walk for 10 minutes at a time or up to two hours in an eight-hour workday, and (3) explain how he determined that plaintiff could lift and/or carry up to 10 pounds occasionally. *See* [*id.*].

"A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "The relevant regulation, SSR 96-8p, lists seven strength functions that an ALJ must consider when assessing a claimant's RFC to work: lifting, carrying, sitting, standing, walking, pushing, and pulling." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773-74 (7th Cir. 2022). "The regulation also requires an ALJ to describe how the evidence supports each conclusion about a strength function, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* at 774 (internal quotation marks and brackets omitted). While "[a]n ALJ's failure to comply with SSR 96-8p's requirements is a sufficient basis, by itself, for [a court] to reverse an ALJ's decision," *id.*, "a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand." *Jeske*, 955 F.3d at 583. Thus the Court "may affirm an ALJ's decision that does not conform with SSR 96-8p's requirements if [the court is] satisfied that the ALJ built an accurate and logical bridge from the evidence to her conclusion." *Jarnutowski*, 48 F.4th at 774 (internal quotation marks and brackets omitted).

Here, the ALJ did not comply with SSR 96-8p because his decision does not include a function-by-function account of plaintiff's exertional abilities. That said,

remand is not required in this case because the ALJ built the required "accurate and logical bridge from the evidence to [his] conclusion" that plaintiff had the RFC to perform a very limited range of sedentary work. *Jarnutowski*, 48 F.4th at 774

### A.    Ability to Sit

Citing primarily to his hearing testimony, plaintiff argues that he struggles to move due to stiffness, especially after sitting down for a while. [25] 12 (citing [14-1] 118). Plaintiff also cites to a function report that he completed in March 2015 stating that he could not sit for a two-hour period without needing to get up to stand or walk due to discomfort in his lower extremities. [14-1] 430. Finally, plaintiff notes that his physical therapist, Barbara Kerr, opined that he could sit for no more than thirty minutes at a time. [25] 13; *see* [14-3] 1783-85.

The ALJ must "consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). "Crucially, however, an ALJ need only include limitations that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). Here, plaintiff has not cited any objective evidence to support his apparent claim that he is limited in his ability to sit during the workday. *See Lisa C. v. Kijakazi*, No. 20-cv-5173, 2023 WL 3436400, at *10 (N.D. Ill. May 12, 2023) (substantial evidence supported decision to omit manipulative limitations from RFC where plaintiff "has not pointed the Court to any objective medical findings that support hand limitations"). Second, while plaintiff relies on the opinion of his physical therapist that he could sit for only thirty minutes at a time, plaintiff ignores the ALJ's ruling that Kerr's opinion was entitled to only "little weight" because the "extreme restrictions" that she identified "are not supported by the physical therapy records, nor consistent with the other medical evidence in the record." [14-1] 24. Because plaintiff does not contest the ALJ's handling of Kerr's opinion, plaintiff has no credible opinion evidence to support his claim that the ALJ should have included a more restrictive sitting limitation in the RFC determination. *See Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) (rejecting plaintiff's argument that ALJ violated SSR 96-8p "by failing to set forth an evaluation of her sitting ability" and emphasizing that "[a] fundamental problem" for plaintiff was that "she offered no opinion from any doctor to set sitting limits . . . greater than those the ALJ set"). Third, the ALJ discussed not only Kerr's opinion about plaintiff's alleged sitting limitation, but plaintiff's subjective reports about a limited ability to sit. *See* [14-1] 19 (noting plaintiff's claim that it was difficult for him to get up after sitting for a while). As the Seventh Circuit has explained, one way a court "can tell the ALJ considered a function is by looking at how the ALJ analyzed the evidence and discussed the claimant's limitations. If the ALJ discussed evidence on a certain function, that discussion may lead [the court] to find the ALJ considered the claimant's ability to perform it." *Jeske*, 955 F.3d at 596. Such is the case here regarding plaintiff's alleged sitting limitation.

### B.   Ability to Stand or Walk

For similar reasons, the Court concludes that substantial evidence supports the ALJ's finding that plaintiff could stand and/or walk for ten continuous minutes and for a total of two out of eight hours.

To begin with, plaintiff cites no opinion evidence suggesting that he was not capable of this amount of standing or walking, *see* [25] 13, and this hole in the record presents a "fundamental problem" with plaintiff's argument. *Gedatus*, 994 F.3d at 904. Moreover, the ALJ rejected the opinion of plaintiff's physical therapist that plaintiff "can sit/stand/walk for less than 2 hours in an 8 hour workday" as unsupported by the therapist's own records [14-1] 30, and plaintiff does not argue that the ALJ erred in rejecting that part of Kerr's opinion. Nor does plaintiff acknowledge that the ALJ accepted Kerr's opinion to the extent she found that plaintiff "had some difficulties walking," *see* [14-1] 22, but could also stand for up to 15 minutes at a time, *see* [14-3] 1783. Furthermore, plaintiff has not cited–and the ALJ noted the absence of, *see* [14-1] 17–objective evidence indicating that he was so limited in standing or walking that he could not perform the limited range of sedentary work provided for in the RFC. *See Lisa C.*, 2023 WL 3436400, at *10. Rather, plaintiff relies on evidence that he presented with a slow or abnormal gait, had knee swelling and tenderness, and experienced weakness in his knee and lower extremities. [25] 13. However, the ALJ discussed much of this evidence in his decision. *See* [14-1] 24 (citing [14-1] 698, 705 (noting that plaintiff walked with slight limp); [*id.*] (citing [14-2] 1001 (observations from April 2015 consultative exam that plaintiff had difficulty getting up and ambulating, but that plaintiff "ambulates without help and assistance" despite "slow gait with a wide base and caution). The ALJ also cited evidence that supported his finding about plaintiff's ability to stand and walk. *See* [*Id.*] 17 (recognizing that plaintiff "has minimal decreased strength" but finding that plaintiff "can ambulate effectively"). Finally, plaintiff's argument is inconsistent with the fact that the ALJ included a walking-related limitation in the RFC: plaintiff "ought not be required to perform more than minimal ambulation on uneven surfaces." [14-1] 17.

Here "the ALJ's discussion shows that the ALJ considered" plaintiff's ability to stand and/or walk, and his conclusion that no more restrictive limitations were warranted was supported by substantial evidence. *Jeske*, 955 F.2d at 596. Accordingly, the Court "need not remand for clearer explanation" on this issue. *Id.*

### C.   Ability to Lift and Carry

Finally, plaintiff contends that the ALJ failed to explain how he determined that plaintiff could lift and/or carry up to ten pounds occasionally or how plaintiff could sustain frequent handling and fingering. [25] 13. The Court rejects this argument. In discussing whether plaintiff's impairments met or equaled a listed

impairment, the ALJ recognized that plaintiff "has complaints of weakness of both the upper and lower extremities" but found that "examinations do not demonstrate any significant limitations or significant abnormal findings" and that plaintiff can "perform fine and gross movements effectively." [14-1] 17. The ALJ was likewise mindful of plaintiff's complaints of hand pain and stiffness, but reasonably found that plaintiff's treatment–particularly his use of hydroxychloroquine–improved his condition. *See* [14-1] 21 (citing [14-3] 1842 (noting plaintiff's "significant improvement in the pain, swelling, and stiffness in his hands and wrists" after starting hydroxychloroquine)); *see also* [14-3] 1842 (plaintiff "reports significant improvement in dexterity through the assistance of occupational therapy"); [14-4] 2183 (plaintiff complaining of "pain aggravated with overuse of hands" but "[o]f note the patient reports that he has not been taking his supplements for the last two months"); [14-2] 1001-02 (April 2015 consultative exam showing that plaintiff had 5/5 grip strength and power in both upper arms). Finally, the ALJ considered the evidence of plaintiff's weakness and decreased strength in the extremities and "account[ed] for periods of decreased strength of the upper extremities" by providing two limitations: "an additional limitation that the claimant can push or pull no more than occasionally" and no "forceful grasping or torqueing [*sic*] or precision manipulation of objects the size of paper clips." [14-1] 17. *See Jeske*, 955 F.3d at 596 (court "can tell the ALJ considered a function . . . if the ALJ acknowledges a specific functional restriction when discussing the claimant's exertional level").

As with plaintiff's other contentions about the ALJ's handling of the physical RFC, this contention fails because (1) plaintiff offers no objective evidence indicating that he was limited in his ability to carry, lift, handle, or finger; (2) the only opinion evidence plaintiff introduced–Kerr's opinion that plaintiff could not use his arms, hands, or fingers at all during a workday, *see* [14-3] 1784–was discredited by the ALJ; and (3) the ALJ's decision shows that the ALJ considered whether plaintiff was limited in these areas of physical functioning. *Accord Jeske*, 955 F.3d at 596.

## IV. The ALJ's Subjective Symptom Analysis Was Not Patently Erroneous.

Plaintiff's last argument is that the ALJ failed to sufficiently assess his pain and activities of daily living (ADLs), as required by SSR 16-3p. [25] 14-16. Plaintiff contends that the ALJ failed to assess the objective evidence that supported his allegations of disabling pain and "offered no discussion as to if, or how, he considered" plaintiff's ADLs. [*Id.*] 15.

"Social Security Regulation 16-3p outlines a two-step process for an ALJ to follow when evaluating a claimant's subjective symptoms. First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his or her symptoms. Next, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's

ability to do basic work activities." *Maria S. v. Kijakazi*, No. 20 C 6727, 2023 WL 7130376, at *7 (N.D. Ill. Oct. 30, 2023) (internal quotation marks and citations omitted). "[T]he ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Charles B. v. Saul*, Case No. 19 C 1980, 2020 WL 6134986, at *6 (N.D. Ill. Oct. 19, 2020) (internal quotation marks and brackets omitted). "The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is patently wrong." *Id.* (internal quotation marks omitted). "[F]laws in the ALJ's reasoning are not enough to undermine the ALJ's decision that [a claimant] was exaggerating her symptoms. Not all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original).

The Court finds that the ALJ's subjective symptom analysis complied with SSR 16-3p and was supported by substantial evidence.

First, the ALJ permissibly discounted plaintiff's statements about the severity and limiting effects caused by his impairments based on the lack of objective evidence supporting those statements. "Although an ALJ may not ignore a claimant's subjective reports . . . simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). As the Court has noted throughout this decision, the ALJ undertook a thorough review of the medical record and discussed multiple instances where objective evidence consistent with plaintiff's allegations and the opinions of plaintiff's treaters was lacking. *See* [14-1] 16-17, 18-25.

Second, the ALJ permissibly considered plaintiff's course of treatment and accurately observed that (1) plaintiff's condition improved with both medications and physical therapy, and (2) "[t]he newly submitted treatment records [*i.e.*, the treatment records that the ALJ obtained after the first hearing] did not show a change in the claimant's treatment, but rather that he underwent routine medical visits for impairments." [14-1] 22; *see Peter R. v. Kijakazi*, No. 20 C 2844, 2022 WL 17093234, at *10 (N.D. Ill. Nov. 21, 2022) (affirming ALJ's subjective symptom analysis where ALJ properly "considered Plaintiff's course of treatment, noting that he exhibited improved functioning with treatment, including occupational therapy, the use of splints, medication, and steroid injections") (internal quotation marks omitted).

Third, and contrary to plaintiff's argument, the ALJ did consider his ADLs. In discussing whether plaintiff's impairments met or equaled a listed impairment, the ALJ stated that "[t]here was no demonstration of significant limitation of daily activities or social functioning." [14-1] 17. Both Dr. Goldstein and the ALJ discussed an August 23, 2013 treatment note that reflected that plaintiff "[d]oes ADLs on own."

[14-1] 24 (citing [14-1] 671). The ALJ also discussed plaintiff's participation in physical and occupational therapy, which was intended to address his "reduced upper extremity strength that was reportedly impairing his activities of daily living." [*Id.*] 20 (citing [14-5] 2552, 2558). Plaintiff contends that the ALJ's decision was deficient because he did not discuss in detail the specific activities in which plaintiff claimed to be limited, such as the fatigue he experienced while showering, difficulties opening jars, and his limited ability to reach due to poor strength. [25] 15. "While the ALJ could have discussed plaintiff's daily activities in more detail," *Marilyn C. v. Kijakazi*, No. 20 CV 1816, 2023 WL 1862988, at \*14 (N.D. Ill. Feb. 9, 2023), the law does not require the ALJ to "discuss every detail in the record as it relates to every factor." *Kevin M. v. Kijakazi*, No. 20 C 6451, 2023 WL 1992186, at \*5 (N.D. Ill. Feb. 14, 2023). Here, the ALJ's discussion of plaintiff's ADLs–albeit brief–convinces the Court that the ALJ did not "ignore an entire line of evidence contrary to [his] ruling," *id.* (internal quotation marks omitted), and the lack of a more detailed discussion of plaintiff's ADLs does not render the ALJ's decision patently erroneous.

Fourth, and also contrary to plaintiff's argument, the ALJ repeatedly acknowledged the evidence reflecting that plaintiff's impairments caused pain in his arms, shoulders, hands, and knees. *See* [*id.*] 19 ("He testified that it [*i.e.* tendonitis in knees] hursts every day and is exacerbated by walking."); [*id.*] (acknowledging claim that Ehler-Danlos causes "joint pain and muscle weakness" and that physical therapy "was causing more joint pain and fatigue"); [*id.*] 21 (discussing Dr. Colbert's treatment notes that mentioned "diffuse hand pain," positive effect that plaintiff's medications had on pain, and plaintiff's report of "significant improvement in pain"); [*id.*] (discussing reports of muscle stiffness, varying degrees of hand pain, and muscle stiffness); [*id.*] (discussing "[t]reatment notes from April 2019" reflecting "right shoulder and right knee pain"); [*id.*] (discussing treatment note from July 2019 reflecting "just some pain in his right shoulder" and "knee pain"). But the ALJ did not fully credit these allegations, a determination that the Court finds to be reasonable and supported by the substantial evidence that plaintiff's pain improved after taking hydroxychloroquine for his connective-tissue impairment and physical and occupational therapy.

Because the Court is "sufficiently able to assess how the ALJ evaluated Plaintiff's symptoms," and because plaintiff "has not demonstrated the ALJ's observations were wrong or that they lacked any explanation or support," the Court rejects plaintiff's fourth ground for reversing the ALJ's decision. *Alisa M. v. Kijakazi*, No. 20-cv-4362, 2022 WL 1104513, at \*6 (N.D. Ill. Apr. 13, 2022).

## Conclusion

For the reasons set forth above, plaintiff's request to reverse and remand the SSA's decision is denied, defendant's motion for summary judgment [28] is granted, and the SSA's decision denying plaintiff's applications is affirmed.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: February 16, 2024**